**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| WILLIAM ODONNELL,<br><br>Plaintiff,<br><br>v.<br><br>SD FRANCHISE INC.,<br><br>Defendant. | Civil Action No. 1:26-cv-10152<br><br>COMPLAINT FOR DECLARATORY<br><br>AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF**

William Odonnell ("Plaintiff"), by and through undersigned counsel, seeks a permanent injunction requiring a change in SD Franchise, Inc.'s (SD Franchise or "Defendant") corporate policies to cause its digital properties to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

**INTRODUCTION**

1. This action arises from Defendant's failure to make its website, https://splashanddashfordogs.com/ (the "Website") accessible to legally blind individuals, which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181- 12189.

2. Because he is blind, Plaintiff cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and/or other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when

using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard." Andrews v. Blick Art Materials, LLC, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

3. Based on a 2010 U.S. Census Bureau report, approximately 8.1 million people in the United States are visually impaired, including 2.0 million who are blind.

4. For this significant portion of Americans, accessing websites, mobile applications, and other information via their computers and smartphones has become critical, especially in the post-pandemic era. Since the pandemic, U.S. e-commerce has continued to grow, with 12 million new users choosing to shop online since 2020. This underscores the importance of access to online retailers.

5. In this climate, it is especially important to consider factors that can facilitate or impede technology adoption and use by people with disabilities.

6. Properly formatted, digital content is universally accessible to everyone. But when it is not, ineffective communication results. In those situations, legally blind individuals must unnecessarily expend additional time and effort to overcome communication barriers sighted users do not confront. These barriers may require the assistance of third parties or, in some cases, may deny outright access to the online service.

7.    Screen access "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

8.    Unfortunately, here Defendant fails to communicate effectively with Plaintiff because its digital properties are not properly formatted to allow legally blind users such as Plaintiff to access its digital content. Accordingly, legally blind customers such as Plaintiff are deprived from accessing information about Defendant's products and using its online services, all of which are readily available to sighted customers.

9.    The United States Department of Justice Civil Rights Division has provided "Guidance on Web Accessibility and the ADA."5 It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

10.    Plaintiff is an advocate of the rights of similarly situated disabled persons and is a "tester" for the purpose of asserting his civil rights and monitoring, ensuring, and determining whether places of public accommodation and their websites are in compliance with the ADA.

3

11. This lawsuit is aimed at providing legally blind users like William Odonnell a full and equal experience.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188, for Plaintiff's claims arising under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, et seq., ("ADA").

13. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a). Defendant is subject to personal jurisdiction in the District of Massachusetts based on the principal place of business of Defendant. Defendant is registered to do business in the Commonwealth of Massachusetts and has been doing business in the Commonwealth of Massachusetts. The pet grooming salon locations are owned by Defendant and are located in the Commonwealth of Massachusetts. Defendant is subject to personal jurisdiction in the Commonwealth of Massachusetts. Defendant also has been and is committing the acts alleged herein in the Commonwealth of Massachusetts, has been and is violating the rights of consumers in the Commonwealth of Massachusetts, and has been and is causing injury to consumers in the Commonwealth of Massachusetts.

## PARTIES

14. Plaintiff William Odonnell is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. Plaintiff suffers from a permanent eye and medical condition that substantially and significantly impairs his vision and limits his ability to see. Plaintiff thus is substantially limited in performing one or more major life activities, including, but not limited to, seeing, accurately visualizing his world, and adequately

4

traversing obstacles. Plaintiff uses VoiceOver screen reader to navigate the internet. Plaintiff William Odonnell is, and at all times relevant hereto has been, a resident of Norfolk County, MA.

15.    Defendant is a Florida Corporation with its principal place of business at 10901 Roosevelt Boulevard North, Building 2C, Suite 900, Saint Petersburg, FL 33716. Defendant specializes in dog grooming and pet care services, including bathing, haircuts, nail trimming, ear cleaning, and specialty spa treatments, and provides access to information about the company's story and locations, services for different dog breeds and coat types, pricing and grooming packages, online booking and appointment scheduling.

16.    Consumers may explore Defendant's goods, other brand-related content and services at https://splashanddashfordogs.com/ ("Website"), the website Defendant owns, operates, and controls.

17.    In addition to researching Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's website access hours of operation and locations details, learn about the membership options, read blog posts, and more.

18.    Defendant is responsible for the policies, practices, and procedures concerning the website's development and maintenance.

19.    Because Defendant's website is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its website to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks prospective injunctive relief requiring Defendant to:

   a) Retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Website, including all third-party content and plug-ins, so the goods and services on the Website may be equally accessed and enjoyed by individuals with vision related disabilities;

5

b) Work with the Web Accessibility Consultant to ensure all employees involved in Website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c) Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Website may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Website, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Directly link from the footer on each page of its website, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website;

h) Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Provide a notice, prominently and directly linked from the footer on each page of its Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j) Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website;

k) Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish

6

procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology;

m) Plaintiff, his counsel, and their experts monitor the Website for up to two years after the Mutually Agreed Upon Consultant validates the Website is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

20.    Websites have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## FACTS APPLICABLE TO ALL CLAIMS

21.    While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

**DEFENDANT'S ONLINE CONTENT**

22.     Defendant's Website allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

23.      Among the features offered by the Website are the following:

      a) Consumers may use the website to connect with SD Franchise on various social media platforms, including Facebook, Instagram;

      b) Access information about pet grooming salon locations, contact details, and hours of operation;

      c) Visitors can browse dog grooming and pet care services, including bathing, haircuts, nail trimming, ear cleaning, and specialty spa treatments, and provides access to information about the company's story and locations, services for different dog breeds and coat types, pricing and grooming packages, online booking and appointment scheduling.

24.     This case arises out of Defendant's policy and practice of denying the blind access to the Website, including the goods and services offered by Defendant through the Website. Due to Defendant's failure and refusal to remove access barriers to the Website, blind individuals have been and are being denied equal access to the pet grooming salon, as well as to the numerous goods, services and benefits offered to the public through the Website.

25.      Defendant denies the blind access to goods, services and information made available through the Website by preventing them from freely navigating the Website.

26.     The Internet has become a significant source of information for conducting business and for doing everyday activities such as shopping, banking, etc., for sighted and blind persons.

27.     The blind access websites by using keyboards in conjunction with screen reading

software which vocalizes visual information on a computer screen. Except for a blind person whose residual vision is still sufficient to use magnification, screen reading software provides the only method by which a blind person can independently access the Internet. Unless websites are designed to allow for use in this manner, blind persons are unable to fully access websites and the information, products, and services contained therein.

28.    There are well established guidelines for making websites accessible to blind people. These guidelines have been in place for several years and have been followed successfully by other large business entities in making their websites accessible. The Web Accessibility Initiative (WAI), a project of the World Wide Web Consortium, which is the leading standards organization of the Web, has developed guidelines for website accessibility. The federal government has also promulgated website accessibility standards under Section 508 of the Rehabilitation Act. These guidelines are readily available via the Internet, so that a business designing a website can easily access them. These guidelines recommend several basic components for making websites accessible, including, but not limited to: ensuring that all functions can be performed using a keyboard and not just a mouse; adding alternative text to non-text content; and adding headings so that blind people can easily navigate the site. Without these very basic components, a website will be inaccessible to a blind person using a screen reader.

### **HARM TO PLAINTIFF**

29.    Plaintiff, as resident of Norfolk, Massachusetts attempted to access the Website for the purpose of evaluating its compliance with the Americans with Disabilities Act ("ADA"). And possibly to make a purchase in the future. As a blind individual who uses screen reader technology, Plaintiff conducts testing of business websites to assess whether digital services are accessible to people with visual impairments. Unfortunately, due to Defendant's failure to design the Website

in a manner compatible with screen access programs, Plaintiff was unable to perceive or understand significant portions of its content. As a result, Plaintiff was denied access to the digital information and services made available to the general public.

30.    On multiple occasions, including most recently on December 23, 2025, Plaintiff attempted to navigate and interact with Defendant's Website using the VoiceOver screen reader software. Each time, Plaintiff encountered access barriers that prevented meaningful interaction with key areas of the site. These persistent obstacles included inaccurate landmark structure, inaccurate heading hierarchy, ambiguous link texts, changing of content without advance warning, unclear labels for interactive elements, redundant links where adjacent links go to the same URL address, all of which interfere with screen reader navigation and comprehension.

31.    As part of his ongoing efforts to monitor and enforce digital accessibility compliance, Plaintiff reviews websites operated by businesses across various industries, including pet care and grooming services. He planned to test the Defendant's website, splashanddashfordogs.com, to determine whether he could independently use the company's services in the future. While searching online for professional dog grooming and pet spa services, he came across the Defendant's website. Positive customer feedback highlighting the quality of the grooming services, care for pets, and convenience of scheduling motivated him to explore the website further. Plaintiff tested the website and attempted to review the grooming services, pricing information, and appointment booking options to determine whether they were accessible and whether he could independently complete his intended action.

32.    On each visit to Defendant's Website, Plaintiff found it difficult, if not impossible, for blind and/or visually impaired individuals, such as himself, to use Defendant's services, as a result of the access barriers that exist. For example, the screen reader had the below problems due to the Website's accessibility issues:

a) Landmark structure was incorrectly defined. Due to repetitive landmark labels, it was difficult for Plaintiff to understand the page section they led to;

b) Heading hierarchy was not properly defined, and there were missing heading levels. As a result, quick navigation through headings on the website did not help Plaintiff effectively find the content and understand the logical structure of the home page

c) Interactive elements were not programmatically associated with their <label> elements. Plaintiff did not understand the purpose of the interactive element on the page as its name was not announced;

d) Several links had ambiguous texts that were unclear to Plaintiff. Lack of detailed description of the link target and destination page made it difficult for Plaintiff to perceive their purpose.

e) Plaintiff encountered repetitive link texts that were announced separately from their context. These links did not provide helpful information and disoriented Plaintiff;

f) Links led to other websites and did not indicate that they were external. Plaintiff was disoriented on another website. The link text failed to warn legally blind customers about the significant change of the context;

g) Several adjacent links had the same link texts and led to the same destinations. It was confusing for Plaintiff to hear the same information multiple times;

h) Plaintiff tried to follow the links from the website and received no prior warning that the links opened new windows. As a result, Plaintiff unsuccessfully

tried to use the "Back" function of the browser to go to the previous page and became disoriented;

i) Interactive elements on the web page had inappropriate and non-descriptive name. Plaintiff could not identify the purpose of the interactive element;

j) The interactive element with "button" functioning was programmatically built using inappropriate tags and did not have the correct "role". Plaintiff received inaccurate information about the purpose of the element in focus.

33.     As a result of these access barriers, Plaintiff was repeatedly denied full and equal access to Defendant's Website. The barriers impeded his ability to evaluate whether the Website offers blind users the same level of access as sighted users and prevented him from independently navigating the site's content or interacting with its features. Although Plaintiff did not access the Website with the intention of making an appointment booking, the discriminatory barriers denied him the opportunity to experience and test the Website on equal terms. Plaintiff intends to return to the Website in the near future to assess whether Defendant has undertaken the necessary steps to bring the Website into compliance with the ADA.

34.     Plaintiff has actual knowledge of the access barriers that make Defendant's Website inaccessible and independently unusable by blind and visually impaired people. Given his experience on a number of occasions, Plaintiff knows that access barriers, such as those described above, exist on Defendant's website as of the date of the filing of this complaint.

35.     By filing this Complaint, Plaintiff has placed Defendant on notice that its Website contains digital barriers that deny blind and visually impaired individuals, including Plaintiff, full and equal access to the services and information it offers. Through this action, Plaintiff seeks to

ensure that Defendant takes the steps required by law to make its Website accessible, not only for himself but for the broader community of individuals with visual disabilities who rely on screen reader technology to navigate the internet. Plaintiff brings this action in furtherance of the ADA's purpose: to eliminate discrimination and ensure equal access to places of public accommodation, including those operating in the digital sphere.

36.    Plaintiff has been unable to—and remains unable to—access the Website in a meaningful way due to the persistent accessibility barriers. Although Plaintiff did not access the Website with the intent to make an appointment booking, the existence of these barriers deters him from returning to conduct further accessibility testing. The discriminatory design of the Website denies Plaintiff equal access and continues to frustrate his efforts to monitor compliance with the ADA.

37.    Defendant engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

(a) constructing and maintaining a website that is inaccessible to blind class members with knowledge of the discrimination; and/or

(b) constructing and maintaining a website that is sufficiently intuitive and/or obvious that is inaccessible to blind class members; and/or

(c) failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind class members.

38.    Defendant utilizes standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others.

39.    These barriers, and others, deny Plaintiff full and equal access to the goods, services, and information Defendant makes available to the general public through its Website.

The ongoing presence of these barriers deters Plaintiff from returning to the Website, as doing so would result in further frustration and unequal treatment. Nevertheless, Plaintiff intends to return to the Website in the near future to determine whether Defendant has remediated the access barriers and brought the Website into compliance with the ADA.

40. If the Website were accessible—meaning Defendant had removed the access barriers—Plaintiff would be able to independently navigate the site, evaluate its digital content, and verify compliance with accessibility standards. Equal access would allow Plaintiff, and other blind and visually impaired individuals, to fully engage with Defendant's online platform without assistance or exclusion.

41. The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

42. Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**FIRST CAUSE OF ACTION**

(Violation of 42 U.S.C. §§ 12181, *et seq.* — Title III of the Americans with Disabilities Act)
(on behalf of Plaintiff)

43. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully herein.

44. Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12182(a), provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of

14

any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." Title III also prohibits an entity from "[u]tilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability." 42 U.S.C. § 12181(b)(2)(D)(I).

45.    The pet grooming salon is a public accommodation within the definition of 42 U.S.C. § 12181(7)(E). The Website is a service, privilege or advantage of Defendant. The Website is a service that is by and integrated with the pet grooming salon. Independent of the pet grooming salon, the Website is also a public accommodation.

46.    Defendant is subject to Title III of the ADA because it owns and operates the Website.

47.    Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(I), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

48.    Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

49.    Specifically, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the

nature of such goods, services, facilities, privileges, advantages or accommodations."

50.    In addition, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(III), unlawful discrimination also includes, among other things, "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

51.    There are readily available, well-established guidelines on the Internet for making websites accessible to the blind and visually impaired. These guidelines have been followed by other large business entities in making their websites accessible, including but not limited to: ensuring that all functions can be performed using a keyboard. Incorporating the basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor result in an undue burden to Defendant.

52.    The acts alleged herein constitute violations of Title III of the ADA, 42 U.S.C. § 12101 et seq., and the regulations promulgated thereunder. Patrons of Defendant who are blind have been denied full and equal access to the Website, have not been provided services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled patrons.

53.    Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

54.    As such, Defendant discriminates, and will continue in the future to discriminate against Plaintiff and members of the proposed class and subclass on the basis of disability in the

full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of the Website and the pet grooming salon in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq. and/or its implementing regulations.

55. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff and members of the proposed class and subclass will continue to suffer irreparable harm.

56. The actions of Defendant were and are in violation of the ADA and therefore Plaintiff invokes his statutory right to injunctive relief to remedy the discrimination.

57. Plaintiff is also entitled to reasonable attorneys' fees and costs.

58. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

(Declaratory Relief on behalf of Plaintiff)

59. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully herein.

60. An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendant denies, that the Website contains access barriers denying blind customers the full and equal access to the goods, services and facilities of the Website and by extension the pet grooming salon, which Defendant owns, operates, and/or controls, fails to comply with applicable laws including, but not limited to, Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq. prohibiting discrimination against the blind.

17

61.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

62.    A preliminary and permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq.;

63.    A preliminary and permanent injunction requiring Defendant to take all the steps necessary to make the Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Website is readily accessible to and usable by blind individuals;

64.    A declaration that Defendant owns, maintains and/or operates the Website in a manner which discriminates against the blind and which fails to provide access for persons with disabilities as required by Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq.;

65.    Plaintiff's reasonable attorneys' fees, statutory damages, expenses, and costs of suit as provided by federal law;

66.    For pre- and post-judgment interest to the extent permitted by law; and

67.    Such other and further relief as the Court deems just and proper.

Dated: January 14, 2025                                     Respectfully Submitted,

                                                                        EQUAL ACCESS LAW GROUP, PLLC
                                                                        *Attorneys for Plaintiff*

                                                                        **/s/ Michael Ohrenberger**
                                                                        By: Michael Ohrenberger

                                                                        68-29 Main Street,

                                                                        Flushing, NY 11367

                                                                        O: 844-731-3343

                                                                        Tel: 716-281-5496

                                                                        Email: mohrenberger@ealg.law